FILED

**B**

Section 5

**JURY**

2021 SEP 18  P 08:17

CIVIL
DISTRICT COURT

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

DOCKET NO. _____                                      DIVISION _____

**ANTHONY J. STEWART, DIANE RALEY, TOMIKA JORDAN, SHEENA ALTINE,
TYELGA J. KEARNEY, PHYLLIS BANKS, RYAN COOPER, ROSLYN ROBERT,
CHRISHANTE RUFFIN, JOYCE WATKINS, JASON C. TULLOS, RANDOLPH H.
GONZALES, JR., 516 ST. PHILIP, LLC, MERCH DAT, LLC., CARNIVAL
COLLECTIBLES LLC, WILLIAM A MYERS, JR., WILLIAM A MYERS, III., AND
ALL OTHER SIMILARLY EFFECTED INDIVIDUALS AND ENTITIES**

v.

**ENTERGY CORP., ENTERGY NEW ORLEANS, LLC,
and ENTERGY LOUISIANA, LLC**

FILED: _____                    _____

                                                              **DEPUTY CLERK**

### ORIGINAL CLASS ACTION PETITION FOR DAMAGES AND JURY TRIAL REQUEST

**NOW COMES**, Petitioners-Plaintiffs, individually and as punitive class representatives, Anthony J. Stewart, Diane Raley, Tomika Jordan, Sheena Altine, Tyelga J. Kearney, Phyllis Banks, Ryan Cooper, Roslyn Robert, Chrishante Ruffin, Joyce Watkins, Jason C. Tullos, Randolph H. Gonzalez, Jr., 516 St. Philip, LLC, Merch Dat, LLC, Carnival Collectibles, LLC, William A. Myers, Jr., William A. Myers, III., and all other effected individuals and entities by and through undersigned counsel, who respectfully file this Original Class Action Petition for Damages, and allege as follows: Entergy Corp., Entergy New Orleans, LLC and Entergy Louisiana, LLC, (hereinafter in this Petition referred to as "Entergy") made defendants herein are liable to Petitioners for the damages they sustained and are still sustaining as a result of Entergy's negligence and other breaches  which caused a system failure leaving southeast Louisiana in darkness, some of which persists at the time of this filing, all of which occurred as a direct result of the foreseeable failure of Entergy's distribution and transmission equipment and systems during Hurricane Ida because despite evidence which demonstrated the weakness and perilous condition of their  equipment and systems which was well known to Entergy, Entergy chose profits over the people they serve.

## VERIFIED

Celeste Davis

- 1 -      2021 SEP 20  A 11:12



## JURISDICTION

1.

This Court has jurisdiction pursuant to the Louisiana Code of Civil Procedure articles 6(A)

and 591 *et seq.*

## PARTIES

2.

Petitioners bring this action on their own behalf and on behalf of others similarly situated

in the respects hereinbelow stated.

3.

### Orleans Parish Property Owners/Lessees/Occupants

a. Petitioner, **Anthony J. Stewart**, is a person of full age of majority, domiciled in
   the Parish of Orleans, State of Louisiana.

b. Petitioner, **Tomika Jordan**, is a person of full age of majority, domiciled in the
   Parish of Orleans, State of Louisiana.

c. Petitioner, **Sheena Altine**, is a person of full age of majority, domiciled in the Parish
   of Orleans, State of Louisiana.

d. Petitioner, **Roslyn Robert**, is a person of full age of majority, domiciled in the
   Parish of Orleans, State of Louisiana.

e. Petitioner, **Phyllis Banks**, is a person of full age of majority, domiciled in the Parish
   of Orleans, State of Louisiana.

f. Petitioner, **516 St. Philip, LLC** is a Louisiana Corporation licensed to do and doing
   business in the State of Louisiana, with its principal place of business in Orleans
   Parish.

g. Petitioner **William A. Myers, Jr.,** is a person of full age of majority, domiciled in
   the Parish of Orleans, State of Louisiana

4.

### Jefferson Parish Property Owners/Lessees/Occupants

a. **Petitioner, Tyelga J. Kearney**, is a person of full age of majority, domiciled in the
   Parish of Jefferson, State of Louisiana.

**B**

Section 5

b. Petitioner, **Diane Raley,** is a person of full age of majority, domiciled in the Parish of Jefferson, State of Louisiana.

c. Petitioner, **Merch Dat, LLC** is a Louisiana Corporation licensed to do and doing business in the State of Louisiana, with its principal place of business in Jefferson Parish.

d. Petitioner, **Jason C. Tullos**, is a person of full age of majority, domiciled in the Parish of Jefferson, State of Louisiana.

e. Petitioner, **Randolph H. Gonzales, Jr**., is a person of full age of majority, domiciled in the Parish of Jefferson, State of Louisiana.

f. Petitioner, **Carnival Collectibles, LLC** is a Louisiana Corporation licensed to do and doing business in the State of Louisiana, with its principal place of business in Jefferson Parish.

g. Petitioner, **Chrishante Ruffin,** is a person of full age of majority, domiciled in the Parish of Jefferson, State of Louisiana.

h. Petitioner, **William A. Myers, III.,** is a person of full age of majority, domiciled in the Parish of Jefferson, State of Louisiana

5.

**Property Owners/Leasees/Occupants of Plaquemines and St. John the Baptist Parishes**

a. Petitioner, **Ryan Cooper**, is a person of full age of majority, domiciled in the Parish of Plaquemines, State of Louisiana.

b. Petitioner, **Joyce Watkins**, is a person of full age of majority, domiciled in the Parish of St. John the Baptist, State of Louisiana.

6.

Made defendants are the following parties:

**a. Entergy Corp.**, a Louisiana Corporation licensed to do and doing business in the State of Louisiana, with its principal business office at 639 Loyola Ave., New Orleans, LA 70113, and with its registered agent, Marcus V. Brown, 639 Loyola Ave., 28th Floor, New Orleans, LA 70113.

**b. Entergy New Orleans, LLC**, a Louisiana Corporation licensed to do and doing business in the State of Louisiana, with its principal business office at 1600 Perdido

- 3 -

**B**

Section 5

St., New Orleans, LA 70112, with its registered agent Marcus V. Brown, 639 Loyola Ave., 28th Floor, New Orleans, LA 70113.

**c. Entergy Louisiana, LLC**, a Louisiana Corporation licensed to do and doing business in the State of Louisiana, with its principal business office at 4809 Jefferson Hwy, Jefferson, LA 70121, and with its registered agent John A. Braymer, 446 North Bld., Baton Rouge, LA 70802.

## VENUE

7.

This Court has venue pursuant to Louisiana Code of Civil Procedure article 42(2) because two of the defendants have their principal place of business in this Parish. Venue is also proper pursuant to La. Code of Civil Procedure art. 73(a) as the defendants are solidary obligors. Further, on information and belief, the conduct and decisions made resulting in the damages claimed occurred in this Parish making venue proper under La. Code of Civil Procedure art. 74.

8.

## THE STORY

Entergy is a holding company founded in 1913, that provides life's bloodline (electricity) to the citizenry that it serves. Entergy's 40 electric power plants located in 12 states, including Louisiana, produce 30 billion watts of electricity and provide services to 3 million customers in 4 states, also including Entergy's home state, Louisiana. Entergy provides electric service to 1.1 million Louisiana customers, or almost 25% of Louisiana's entire population, in 53 of 64 parishes, over a geographic area of 114 thousand square miles, an area larger than all but 5 states in the United States of America.

9.

Entergy is a member of the exclusive Fortune 500 club, being larger than US Steel, Norfolk Southern Railway, and the Coors Beverage Corporation, with a total of $50,000,000,000 in assets and an annual income of $11,000,000,000.

10.

When Entergy first chose to apply for and become the sole power provider in 53 Parishes, they were well aware of the fact that they were going to be responsible for having a system and its

- 4 -

E-Filed

**B**

Section 5 components, that would be required to sustain repeated exposure to extreme weather conditions

and that the entirety of their transmission system would on occasion be severely tested. In the

process of securing and maintaining the privilege of having the exclusive right to service these

customers, Entergy repeatedly assured the State and other public entities that they were up to the

job. This job of providing reliable energy would have to face numerous and regular tropical storms

and hurricanes. To accomplish this, the equipment, poles, lines, and transmission equipment

would require that it be well maintained and regularly surveyed (repaired/replaced) for any

possible conditions that could plummet Louisiana into darkness and idle the functioning of other

necessary systems such as pumps and sewerage.

11.

Historically, Louisiana would face at least two (2) tropical storms every three (3) years and

one full blown hurricane every two point 8 (2.8) years. However, Entergy, along with most of the

world, has become aware that the climate of the world (including southeast Louisiana) is changing,

and not for the better. In 2020, alone Louisiana faced four (4) category 2-4 hurricanes, and one (1)

severe tropical storm. Entergy also knows that besides the wind events, Louisiana experienced

more severe periods of heat and flooding. Entergy's job is to protect the delivery of their product

(electricity), a job that because of their government monopoly and lack of competition, requires

regular and keen diligence on its part. Where Entergy has many choices on how to conduct its

business and most especially its decision to service southeast Louisiana, Petitioners have no

choice, they must accept what Entergy delivers.

12.

In the case of Hurricane Ida, Entergy through their grossly inadequate maintenance and

inspection program failed miserably in that obligation by using antiquated equipment, shotty

maintenance, and lies to the City, the State, and their customers. Entergy created a system that

could not and would not sustain even a hurricane with wind gusts below 100 miles per hour.

Entergy made the decision to not invest in the underground transmission of electricity, which in

an environment like Southeast Louisiana, they could have assured regular consistent and sustained

protected service to all their customers, not just in affluent neighborhoods. Instead, Entergy chose

the bubble gum and super glue approach to protect their billions of dollars instead of their

customers, that every month paid Entergy so that they would not have to live in darkness. Or,

- 5 -

**B** Section 5 instead of asking its customers for billions of dollars for restoration and hurricane response, it

could have invested that money in hardening the systems.

13.

Entergy's greed and lies set the foreseeable stage for hundreds of thousands of people to be left without refrigeration, air conditioning, and in many cases sewerage disposal. Entergy's negligence also led to thousands of people not only sitting without lights but unable to learn what the storm and electric failure wrought. Thousands of people suffered and suffer unnecessarily because of Entergy's failure to do what they promised to do; as Louisiana Civil Code art. 2315 provides "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

## FACTS

### Entergy what it is and what it is responsible for

14.

On information and belief, Entergy is the sole provider of electricity transmissions to Petitioners and others similarly situated throughout Southeast Louisiana and has done so for decades. Entergy has contracts or implied contracts with its customers which are subject to regulation by the Public Service Commission and the City of New Orleans and owes duties to those customers and also to third-party beneficiaries (stipulations *pour autri*) to that contract or implied contract, i.e., residents of hospitals, healthcare facilities, nursing homes, and other residents who are not the named individual on the Entergy billing statements as per the Louisiana Civil Code.

15.

Entergy designed and constructed, and owns and operates, the Entergy transmission system (the "Transmission System") that provides electricity to Southeast Louisiana.

16.

The Transmission System generates and delivers power to citizens, businesses, government agencies, and others.

17.

The Entergy Transmission System is a utility system that generates and moves high voltage bulk electric power from generating plants of the Entergy Operating Companies (including Entergy

- 6 -

**B**

Section 5

FILED
2021 SEP 18  P 08:17
CIVIL
DISTRICT COURT

New Orleans, LLC and Entergy Louisiana, LLC) and third parties across an interconnected system of distribution lines, transmission lines, and substations.

### The Laws, Regulations, and Rules Entergy Must Abide

18.

Entergy is subject to the rules and regulations of the U.S. Department of Energy and the Louisiana Public Service Commission, the City of New Orleans, among other governmental entities and agencies.

19.

Pursuant to Louisiana Revised Statute 48:381.3 (Duty of care associated with placement of public utility facilities on or adjacent to rights-of-way or state highways), Entergy was and is required to adhere to National Electrical Safety Code ("NESC") guidelines for the design, installation, construction, operation, inspection, and maintenance of utility transmission systems.

20.

"The avowed purpose of the NESC is to provide basic guidelines for safeguarding persons from hazards arising from the installation, operation, or maintenance of overhead electric supply lines, and its requirements reflect the minimum provisions considered necessary for the safety of employees and the public." *Foley v. Entergy La., Inc.*, 06-0983 (La. 11/29/06), 946 So. 2d 144, 159.

21.

Standards within the applicable edition of the Department of Transportation and Development standards also apply to Entergy.

22.

Entergy is also mandated to adhere to local standards, including but not limited to:

a) City Ordinance 158-892 ("Repairs to be made") provides that "All companies shall make necessary repairs to their lines of conductors. The permit to make such repairs does not, however, cover the erection in any street, alley or public place of any additional poles, wires, fixtures or similar structures."

b) City Ordinance Chapter 158, Division 2, at Section 158-1044, et seq. is the "Bill of Rights" that provides ratepayers with certain rights. This includes the "right to safe and reliable service in accordance with industry standards." See Section 158-1045.

- 7 -

**B**

**Section 5**

23.

Entergy is also bound by several provisions of the Louisiana Civil Code including but not limited to arts. 2315, 2317, and 2322.

**Entergy was on Notice of Serious Systemic Deficiencies in its Systems**

24.

After the devastating 2005 and 2008 hurricane seasons, in 2010, the U.S. Department of Energy, issued a study ("Hardening and Resiliency: U.S. Energy Industry Response to Recent Hurricane Seasons"). The study focused on "aging infrastructure and hurricane hazards." The study noted that "aging infrastructure is more susceptible than newer assets to the hurricane-related hazards" of, for example, "extreme winds." The study noted that electric utilities have invested in construction projects, but that the investments "are limited by comparison with the level of effort required for wind protection."

25.

This 2010 study was directed in part to Entergy's transmission system in Southeast Louisiana and put Entergy on notice of the susceptibility and likelihood of their equipment to fail.

26.

According to the Washington Post (8/31/2021), "ENTERGY, the power provider for 3 million customers in the Gulf region, has over the past decade been fined for deferring maintenance of its aging infrastructure and criticized for moving too slowly to reinforce its grid against severe weather. The company resisted calls to increase investments in renewable energy sources, which climate advocates see as a way to prevent widespread outages." https://www.washingtonpost.com/business/2021/08/31/ida-entergy-hurricane-louisiana-power/

27.

In 2007 and in direct response to the 2005 Hurricanes Katrina and Rita, Entergy performed a "Hardening Study." This study provided Entergy sufficient information needed to develop strategies to harden its infrastructure for Southeast Louisiana.

28.

Hardening refers to physically changing the infrastructure to make it less susceptible to damage from extreme wind, flooding, or flying debris. Hardening improves the durability and stability of energy infrastructure, making it better able to withstand the impacts of hurricanes and weather events without sustaining major damage. Resiliency, by contrast, refers to the ability of

- 8 -

**B**

**Section 5** an energy facility to recover quickly from damage to any of its components or to any of the external

systems on which it depends. Resiliency measures do not prevent damage; rather they enable

energy systems to continue operating despite damage and/or promote a rapid return to normal

operations when damages/outages do occur.

29.

The 2007 Hardening Study also showed Entergy that it needed to support coastal

transmission lines with concrete and steel poles, rather than wood poles[1].

30.

On information and belief, Entergy did not comply with its 2007 Hardening Study.

31.

On September 9, 2021, Entergy CEO Phillip May, claimed newly built and restored towers

and wires and strengthened substations are engineered to withstand 150 mph winds.

https://www.wwltv.com/article/news/investigations/david-hammer/regulators-question-entergys-

transmission-upgrades-after-catastrophic-failure/289-757c5b6d-fa64-4c65-9015-bdce5cbc1fd0

32.

According to a 2016 Entergy "Resilience Plan", Entergy began "hardening" transmission

lines against storms in the 1960s. Also, Entergy reinforced equipment to withstand winds of up to

140 mph, the speed of Hurricane Betsy's strongest winds, which Entergy noted is "well beyond

the National Electrical Safety Code (NESC) requirements." The study noted that "Entergy's

primary acute vulnerability is to extreme weather events that result in outages." However, Entergy

had no adequate redundancy system capable of rerouting electricity effectively and immediately.

33.

According to the 2016 Resilience Plan, "During the design phase, wind loading on

structures is in accordance with IBC (International Building Code) and ASCE 7 (American Society

of Civil Engineering—Minimum Design Loads for Buildings and other structures) standards.

ASCE 7 provides users with site-specific wind speeds used in the determination of the design of

wind loads for the buildings and structures. ASCE 7 also addresses design loads for seismic, rain,

and ice impacts. The IBC addresses the design and installation of building systems and provides

regulations that safeguard the public health and safety in all communities, large and small."

---

[1] They were particularly critical of the high-capacity tower

- 9 -

34.

In 2015, a decade after Katrina, the New Orleans City Council complained that Entergy had yet to provide the Council with "a comprehensive, detailed storm hardening plan," including detailed costs, a timeline, and benefits.

35.

Entergy recently cut \$150 million in "O&M" (Operations and Maintenance) expenses, which includes, among other things, poles, and upkeep of substations.

36.

During a 2018 City Council meeting, an Entergy executive admitted to deliberately reducing the company's investment in the power grid by about \$1 million, because, she said, the company was seeing strong performance and "we didn't want to spend money on a system that was performing extremely well," according to notes included in a City Council report.

37.

According to the City Council report, the "slight drop" in funding was responsible for an increase in customer power outages from 2013 to 2017. In 2019, the City fined Entergy \$1 million after finding that it had failed to properly maintain electricity poles and wires following a series of power failures from 2014 to 2017 and asked it to increase investments in the grid.

38.

In 2018, Entergy revealed that broken equipment caused between 73 and 81 percent of power outages in each of the past five years. Those outages followed Entergy's 2013 decision to raid \$1 million from a pool of money slotted for repairs, which Entergy vice president for customer service Melonie Stewart indicated was because the distribution system at that time was "outstanding." Ms. Stewart said, "We didn't want to spend money on a system that was performing extremely well." "But as we backed off from that funding, we did see the reliability go in the wrong direction."

39.

Before Hurricane Ida hit Southeast Louisiana, it was Entergy's position that its systems which provided power to 1.1 million residents and businesses, could withstand winds of 150 mph. Entergy was wrong in this opinion and the studies presented to it and in which it participated provided sufficient information for Entergy to know and understand that its beliefs about the

- 10 -

2021 SEP 18  P 08:17
CIVIL
DISTRICT COURT

**B**

**Section 5**

strength of its system and its component parts would likely fail at wind speeds significantly lower than 150 mph.

## Hurricane Ida

40.

Hurricane Ida was first monitored as a storm by the National Hurricane Center on August 23, 2021.

41.

On August 26, 2021, it became known as Tropical Depression Nine.

42.

On August 26, 2021, it morphed into Tropical Storm Ida.

43.

On August 27, 2021, it strengthened into Hurricane Ida ("Ida").

44.

On August 28, 2021, Ida underwent a rapid intensification due to warm sea surface temperatures.

45.

On August 29, 2021, Ida made landfall near Port Fourchon, Louisiana.

46.

The weather station at Louis Armstrong International Airport in New Orleans reported a sustained wind speed of 64 mph and a wind gust of 90 mph.

47.

The National Weather Service measured wind speeds in Waggaman, finding maximum wind gusts of 92 mph. Hurricane Ida's known peak wind gust recorded in the City of New Orleans was 90 mph, all of these wind gusts were significantly below the purported 150 mph rating for their towers.

48.

Entergy estimates that there were about 950,000 outages of electrical services after Ida made landfall.

**B**

Section 5

49.

On September 1, 2021, Entergy estimated that as of August 31, 5,112 poles, 5,906 transformers, and 1,185 spans of wire were damaged or destroyed, with further damage assessment ongoing.

50.

Entergy announced that more than 2,000 miles of transmission lines were out of service, along with 216 substations.

51.

Entergy announced that there was damage to eight high-voltage lines that took out power for New Orleans and Jefferson, St. Bernard, and Plaquemines parishes, as well as parts of St. Charles and Terrebonne parishes.

52.

Because the Sewerage and Water Board of New Orleans ("SWB") relies on Entergy to run its 84 sewer lift stations, and because Entergy's transmission line failures caused a power outage, SWB was forced to pump raw sewage into the Mississippi River. This continued through September 6, 2021.

53.

The 400-foot-tall transmission tower with transmission lines over the Mississippi River to the New Orleans area (hereinafter, the "River Tower" or "Avondale Tower") collapsed, and its conductor landed in the Mississippi River, causing widespread outages.

54.

The River Tower is located in Avondale/Bridge City area on River Road at approximately Lat/Long 29.928444499210215, -90.17900987736854.

55.

The River Tower delivers power from the Waterford power plants on the West Bank of St. Charles Parish through Avondale to Harahan on the East Bank

56.

According to Entergy, the River Tower passed inspections and was deemed to have no structural issues, and did not need any upgrades, as recently as December 2020.

- 12 -

20Case 3681-cv-01834-EEF-MBN   Document 1-1   Filed 10/06/21   Page 13 of 23

**B**

Section 5

57.

2021 SEP 18 P 08:17
CIVIL
DISTRICT COURT

Prior to Ida, Entergy CEO Phillip May stated, "That [River Tower] was very robustly engineered." "We're not going to go in and proactively replace a tower like that. I mean, that is an enormously expensive engineered structure."

58.

The River Tower either did not follow "industry practice" and have guide wires to strengthen the tower from extreme winds, or it did not have guide wires that were sufficiently strong to prevent the tower's collapse. Obviously, Entergy has not done appropriate study and analysis of the tower, including the steel's integrity that has been repeatedly subjected to severe stresses, like Hurricane Katrina in 2005.

59.

In addition to the River Tower, the seven other transmission towers also failed, and according to Entergy, the cause was wind damage to twelve of the 1,500 poles or towers that carry those seven lines. Seven of those twelve structures (poles or towers) were destroyed, and five others were damaged. All of which speaks legions to the inadequacy of Entergy's inspections and maintenance programs.

60.

On information and belief, the New Orleans Sewage & Water Board relies on Entergy and backup generators to keep the drainage pumps operational. But the failure of the Entergy Transmission System, as well as the failure of the backup generator on the Westbank, led to the inability to pump water out of the Algiers neighborhoods, resulting in the flooding of that part of New Orleans.

**The 9th Ward, the French Quarter, and the CBD**

Entergy built a $210 million, 128-megawatt, natural gas-fired plant (the "New Orleans Power Station" or "NOPS") in New Orleans East.

61.

In 2017, Entergy argued in favor of construction of NOPS, in part, by arguing that it would help provide energy if the city became "electrically islanded' from the rest of the interconnected transmission grid, as it was after Hurricane Gustav."

- 13 -

2021-07681-cv-01834-EEF-MBN   Document 1-1   Filed 10/06/21   Page 14 of 23

**B**

Section 5

62.

2021 SEP 18   P 08:17
CIVIL
DISTRICT COURT

In 2018, Entergy paid actors from $60 to $200 each to go to New Orleans City Council meetings and pretend to support construction of NOPS, for Entergy's fraud, the city council of New Orleans fined Entergy $5 million. https://readersupportednews.org/news-section2/318-66/49935-actors-were-paid-to-attend-new-orleans-city-council-meetings-supporting-power-plant

63.

NOPS purportedly became operational in May 2020.

64.

NOPS was purportedly designed with a "black start" capability, to allow the plant to be operated even if disconnected from the national power grid. NOPS independently was supposed to have the ability to power about 10% of the City of New Orleans' energy needs.

65.

After Hurricane Ida passed through southeast Louisiana, NOPS sat idle and undamaged.

66.

NOPS was not in use until September 1, 2021, at which point it only served a small section of the New Orleans East.

67.

The failure to activate or turn on NOPS resulted in portions of the City of New Orleans not having power for several days. Those within the NOPS grid were specifically damaged as a result of this failure.

68.

On September 4, 2021, Entergy restored three of the eight transmission lines, bringing the restoration total to six of the eight transmission lines, as of that day, the two transmission lines that were supposed to go the River Tower remained down.

69.

Ironically, Entergy is seeking to charge customers to cover $2.4 billion in power restoration costs for 2020 storms that affected Louisiana, including Hurricanes Laura, Delta, and Zeta. No one yet knows what Entergy will charge its customers for its costs resulting from its failure to properly harden and maintain its systems following Hurricane Ida.

- 14 -

Case 2:21-cv-01834-EEF-MBN   Document 1-1   Filed 10/06/21   Page 15 of 23

**B**

Section 5

2021 SEP 18   P 08:17
CIVIL
DISTRICT COURT
FILED

70.

As a result of the failure of the Transmission System, plaintiffs have suffered significant damages. Entergy was well aware that the failure of their transmission system would result in a disaster like the inability to supply power to their customers and the Sewerage and Water Board, that would result in their customers to suffer damages, which include but are not limited to:

a) Emotional distress, mental anguish, physical fear, and fright;

b) Loss of habitation and the cost of relocation and other costs associated with having to live outside of their home;

c) Growth of mold and mildew inside of their home and the restoration thereof;

d) Physical injury resulting in the loss of electricity, particularly to those people unable to leave their home; and

e) Wrongful death of 10+ individuals who perished as a result of the power outage as of the date of this filing.

(These damages can be addressed in subclasses subsequent to the trial of liability of all parties.)

71.

Many of the citizenry serviced by Entergy were required to evacuate and find other accommodations as far away as Atlanta, St. Louis, Houston, and other cities of equal distance, or to endure the horrors of living without electricity and being cut off from the rest of world, without the ability to cook, work and/ or maintain their business all in environment without air conditioning.

72.

Petitioners have incurred and will continue to incur substantial costs in response to the failure of the Transmission System, as well the other costs which will be proven at the trial of this matter.

73.

Based on past experiences, it was clearly foreseeable that Entergy's equipment would be required to endure and survive magnitude of Ida or greater.

74.

It is beyond dispute that Entergy was aware of the foreseeability of a storm like Ida or greater, could hit their serviced area in Louisiana. Knowing this, Entergy consciously chose not to

- 15 -

2021 SEP 18  P 08:17
CIVIL
DISTRICT COURT

**B**

**Section 5**

design, install, construct operate, inspect, or maintain their Transmission System as a reasonable electric supplier/producer.

75.

Entergy failed to adhere to minimum standards of NESC in the following ways:

a. Under NESC 214, when lines and equipment are in service, "Lines and equipment with recorded defects that could reasonably be expected to endanger life or property shall be promptly repaired, disconnected, or isolated." Under information and belief, Entergy's Transmission System had recorded defects that could reasonably be expected to endanger life and property, but these defects were not repaired, disconnected, or isolated. These defects and the failure to repair these defects, contributed to the failure of the Transmission System both independently and cumulatively.

b. It is required under NESC Part 2 (Safety Rules for Overhead Lines) Section 25 has "wind loading" rules. 25(C) has "extreme wind loading" rules that requires calculating horizontal wind loads, which are "applied to the entire structure and supported facilities." "Wind velocity usually increases with height; therefore, experience may show that the wind pressures specified herein need to be increased." Figure 250-2 has "basic wind speed" and indicates the "fastest-mile speeds at 33 ft (10 m) above ground for exposure category C and are associated with an annual probability of 0.02." New Orleans is at 100 mph almost exactly (based on the map).

c. Under NESC 252: "Where a combination of vertical, transverse, or longitudinal loads may occur simultaneously, the structure shall be designed to withstand the simultaneous application of these loads. NOTE: Under the extreme wind conditions of Rule 250C, an oblique wind may require greater structural strength than that computed by Rules 252B and 252C."]

76.

National Electrical Safety Code (NESC) changes in 2007 required structures (like the Entergy towers) to withstand 140 mph winds along the Louisiana coast.

- 16 -

77.

Entergy failed to adhere to minimum standards of the Department of Transportation Development.

78.

Entergy failed to adhere to local standards in the following ways:

a) City Ordinance 158-892 ("Repairs to be made") provides that "All companies shall make necessary repairs to their lines of conductors. The permit to make such repairs does not, however, cover the erection in any street, alley or public place of any additional poles, wires, fixtures or similar structures."

b) City Ordinance Chapter 158, Division 2, at Section 158-1044, *et seq*. is the "Bill of Rights" that provides ratepayers with certain rights. This includes the "right to safe and reliable service in accordance with industry standards." *See* Section 158-1045.

**Causes of Action**

79.

Even if Entergy adhered to the statutory standards, Entergy was nevertheless negligent in the following non-exclusive ways:

a. Failure to use reasonable care to keep the transmission towers and power lines in a safe condition;

b. Failure to properly design, construct, and install its Transmission System, including but not limited to, distribution and/or transmission towers and power lines;

c. Failure to inspect its Transmission System, including but not limited properly/adequately to, distribution and/or transmission towers and power lines;

d. Failure to establish proper procedures for inspection and maintenance of the Transmission System, including but not limited to, their equipment, including the towers and power lines;

e. Failure to implement and follow those proper procedures listed above.

f. Failure to maintain and repair its Transmission System, including but not limited to, distribution and/or transmission towers and power lines; properly/adequately;

- 17 -

**B**

Section 5

g. Failure to warn the public, including plaintiff, of the dangerous condition of the Transmission System, including but not limited to, towers and power lines;

h. Failing to discover or repair the River Tower and other aspects of the Transmission System;

i. Acting in a careless and negligent manner without due regard for the safety of others;

j. Failing to use due care and caution under the existing circumstances;

k. Considering the admonitions, warnings, and sanctions given to Entergy, Entergy should have warned the public of the damages that could result from their failure to comply or act on the warnings admonitions and sanctions; and

l. Any and all other acts of negligence by Entergy and/or their employees, agents, and representatives which may be discovered between now and the time of the trial of this matter.

80.

Petitioners plead the doctrine of strict liability asserting that Entergy, as the transmission system, towers, and power lines owners and custodians, knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect, in the lines which caused the widespread outages in southeast Louisiana, and that the damage could, and would, have been prevented by the exercise of reasonable care.

81.

Entergy is strictly liable for the causes of widespread outages and corresponding damages.

a) Entergy is the owner/custodian of the Transmission System;

b) It was within the sole discretion of Entergy, to properly construct, inspect, repair, replace, or maintain the Transmission System that is the subject of this Litigation;

c) The widespread outages were caused by a ruin, vice, or defect in the power lines;

d) Entergy unquestionably should have known of the defective condition of their Transmission System and;

e) Entergy obviously failed to exercise reasonable care and vigilance.

- 18 -

82.

The actions of Entergy were willful violations of applicable safety standards and statutes in their failure to do proper testing, maintenance, and inspection procedures on the Transmission System and, as a result, Entergy's conduct constituted negligence *per se*.

83.

In addition to the negligence stated above, and in the alternative thereto, the injuries and damages suffered by the Plaintiffs and others were caused by acts and omissions of Entergy, which acts, or omissions may be beyond proof by the Petitioners, but which were within the knowledge and control of Entergy, there being no other possible conclusion than that the failure of the Transmission System resulted from the negligence of Entergy. The damage and injuries would not have occurred had Entergy exercised the requisite degree of care for management of a Transmission System in this location, and the Petitioners therefore plead the doctrine of *res ipsa loquitur*. Simply put, the fact that all eight towers failed in the face of wind clearly 1/3 or 50mph below the maximum wind speed that the president of Entergy guaranteed the public that these towers would sustain, bespeaks of a gross lack of observation, maintenance, and repairs on Entergy's part.

84.

Entergy breached its express and implied contracts.

85.

The widespread outages and corresponding damages were caused by the negligence and strict liability of Entergy and/or their agents, employees and assigns for all reasons stated herein, and all without any negligence on behalf of the citizens of Southeast Louisiana.

**Class Allegations**

86.

This is an issue-based class action brought pursuant to La. C.C.P. art. 591, et seq., on behalf of all persons or entities who have been damaged as a result of the failure of the Entergy's distribution and transmission systems that supplies power to southeast Louisiana during and after Hurricane Ida.

- 19 -

87.

The common issue is Entergy's liability for their negligence and other breaches outlined above resulting in its failure to supply electricity to their customers, some of whom remain without power today, the date of this filing. The issue-based class is manageable in as much as the issue of liability can be tried to one jury. And once Entergy's liability is determined, the Court may maintain subclass(s) for individual damages (including wrongful death) which then could be tried by this Court in groups with specific commonality, typicality, and numerosity.

88.

Until a more precise determination is made of all persons affected by the failure of the Transmission System, the Plaintiffs allege that the class consists of all persons affected by power outages and residing in the Parishes of within the service area of the Entergy who sustained personal, mental, and economic damages, and/or inconvenience as a result of the failure of the Transmission System resulting from Hurricane Ida.

89.

This action is appropriate for determination through the Louisiana Class Action Procedure (La. C.C.P. Art. 591, *et seq*.) for the following reasons:

a) The substantial number of potential claimants present a level of numerosity better handled through the class action procedure as opposed to a mass joinder of individual claims;

b) The common issues of law and fact pertaining to the determination of fault and the liability for compensatory damages predominate over the individual issues of quantum;

c) The determination of fault may be made in the class action under the provisions of La. C.C.P. art. 592.1(C)(1), (2) & (3) without the necessity of proof at that time as to the amount of those damages, thereby establishing guidelines for settlement and/or subsequent trials in individual cases if necessary; thereby simplifying and expediting the resolution of this matter.

d) Petitioners herein have sustained damages of the nature described hereinabove and are suitable representatives of the class (subclasses);

e) The plaintiff representatives herein are represented by skilled attorneys who are experienced in the handling of mass tort class actions of this type[2] and who may be expected to

[2] New Orleans Train Explosion

- 20 -

**B**

Section 5

handle this action in an expeditious and economical manner to the best interests of all the class membership; and

f) The Louisiana Class Action Procedure affords a superior vehicle for the efficient disposition of the issues and claims herein presented, especially in situation such as this the number of claimants may exceed numbers that would exhaust the resources of this Court and protract litigation over many years.

90.

Greater than two-thirds of the members of the proposed class in the aggregate are citizens of Louisiana.

91.

Each of the three defendants are defendants from whom significant relief is sought by members of the plaintiff class, whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class, and who are citizens of Louisiana.

92.

All the conduct of Entergy complained of herein and resulting damages occurred in Louisiana. No claim is made under any federal law.

93.

On information and belief, during the three-year period preceding the filing of this class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons.

94.

Excluded from the Class are:

a) the officers and directors of the Defendants;

b) any judge or judicial officer assigned to this matter and his or her immediate family; and

c) any legal representative, successor, or assign of any excluded persons or entities.

95.

Petitioners request a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, the Petitioners pray that:

E-Filed

**B**

**Section 5**

1) Entergy be cited to appear and answer this ORIGINAL CLASS ACTION PETITION FOR DAMAGES AND JURY TRIAL REQUEST;

2) after due proceedings are had, that this action be certified as a class action pursuant to the provisions of La. C.C.P. art. 591, *et seq.*, in the respects alleged hereinabove, for the purposes of determining the common issue of liability as well as damages, if the Court so desire and the basis for assessment of all damages, if any;

3) upon certification of the class action, the Court call for the formulation of a suitable management plan pursuant to La. C.C.P. art. 593(C); and

4) after due proceedings, that judgment be entered awarding damages and any other legal and equitable relief that may be available.

Respectfully Submitted:

*/s/ Stuart H. Smith*

_____

Stuart H. Smith (LA#17805)
Barry J. Cooper, Jr. (LA#27202)
Andrew Jacoby (LA# 32512)
COOPER LAW FIRM, LLC
1525 Religious Street
New Orleans, Louisiana 70130
Phone: 504-399-0009
Fax: 504-309-6989
Email: ajacoby@clfnola.com

**AND**

Jack Harang (LA#15083)
HARANG LAW OFFICES
3500 North Hullen Street
Metairie, Louisiana 70002
Phone: (504) 810-4734
Email: jwharang@gmail.com

**AND**

Juan Lafonta (LA#27541)
JUAN LAFONTA AND ASSOCIATES
6305 Elysian Fields Avenue, Suite 207
New Orleans, LA 70122
Phone: (504) 288-4911
Email: jlafonta@lafontalaw.com

**HOLD FOR SERVICE**

- 22 -

2021 SEP 18  P 08:17
CIVIL
DISTRICT COURT

**B**

Section 5

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

DOCKET NO. _____                                    DIVISION _____

**ANTHONY J. STEWART and DIANE RALEY and TOMIKA JORDAN and SHEENA ALTINE and TYELGA J. KEARNEY and PHYLLIS BANKS and RYAN COOPER and ROSLYN ROBERT and CHRISHANTE RUFFIN and JOYCE WATKINS**

v.

**ENTERGY CORP. and ENTERGY NEW ORLEANS, LLC and ENTERGY LOUISIANA, LLC**

**VERIFICATION**

**BEFORE ME,** the undersigned Notary Public, duly commissioned and qualified in and for the

aforesaid state and parish, personally came and appeared

**DIANE RALEY**

who, after being first duly sworn, did depose and say:

That **DIANE RALEY** is the plaintiff and petitioner in the above and foregoing Original Petition,

that she has read the same, and that all allegations of fact therein contained are true and correct to

the best of her knowledge, information, and belief.

_____

DIANE RALEY

**SWORN TO AND SUBSCRIBED** before me, this ___ day of _____, 2021.

_____

NOTARY PUBLIC

- 23 -