CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

DOCKET NO. 2021-07365          SECTION: 5          DIVISION: B

ANTHONY J. STEWART, DIANE RALEY, TOMIKA JORDAN, SHEENA ALTINE, TYELGA J. KEARNEY, PHYLLIS BANKS, ROSLYN ROBERT, CHRISHANTE RUFFIN, JASON C. TULLOS, RANDOLPH H. GONZALES, JR., 516 ST. PHILIP, LLC, WILLIAM A MYERS, JR., WILLIAM A MYERS, III., GEORGE ALVIN BOUIE d/b/a WILSON'S SHOE REPAIR, LLC, VERA WARREN WILLIAMS d/b/a COMMUNITY BOOK CENTER, LLC, JAMES RALEY, COLLEEN RALEY, JANET KALANET, KEITH GELPI, LEXIE KEYS, BAILEY KEYS, LARRY GUILLORY, SHELLEY GUILLORY, ANDREW CASSARA, MATADOR, LLC, WE THE PEOPLE, LLC, CURE, LLC, AND ALL OTHER SIMILARLY AFFECTED INDIVIDUALS AND ENTITIES

v.

ENTERGY CORP., ENTERGY NEW ORLEANS, LLC,
and ENTERGY LOUISIANA, LLC

FILED: _____          _____
                                                      DEPUTY CLERK

SECOND AMENDED CLASS ACTION PETITION FOR DAMAGES
AND JURY TRIAL REQUEST

NOW COMES, Petitioners-Plaintiffs, individually and as putative class representatives, Anthony J. Stewart, Diane Raley, Tomika Jordan, Sheena Altine, Tyelga J. Kearney, Phyllis Banks, Roslyn Robert, Chrishante Ruffin, Jason C. Tullos, Randolph H. Gonzalez, Jr.,  516 St. Philip, LLC, William A. Myers, Jr.,  William A. Myers, III, George Alvin Bouie d/b/a Wilson's Shoe Repair, LLC, Vera Warren Williams d/b/a Community Book Center, LLC, James Ralley, Colleen Raley, Janet Kalanet, Keith Gelpi, Lexie Keys, Bailey Keys, Larry Guillory, Shelley Guillory, Andrew Cassara, Matador, LLC, We The People, LLC, Cure, LLC, and all other affected individuals and entities by and through undersigned counsel, who respectfully file this Second Amended Class Action Petition for Damages. Plaintiffs allege as follows: Entergy Corp., Entergy New Orleans, LLC, and Entergy Louisiana, LLC, (hereinafter in this Petition referred to as "Entergy"), a single business enterprise, made defendants herein, are liable to Petitioners for the damages they sustained, and are still sustaining, as a result of Entergy's negligence and other breaches, which caused a system failure that left southeast Louisiana without power. Some areas were still without electricity at the time of original filing. The power outage occurred as a direct result of the foreseeable failure of Entergy's distribution and transmission equipment and systems during Hurricane Ida because despite evidence which demonstrated the weakness and perilous

1

condition of their equipment and systems, all of which was well known to Entergy. Entergy chose profits over the people they serve.

**JURISDICTION**

1.

This Court has jurisdiction pursuant to the Louisiana Code of Civil Procedure articles 6(A) and 591 *et seq*.

**PARTIES**

2.

Petitioners bring this action on their own behalf and on behalf of others similarly situated in the respects hereinbelow stated.

3.

**Orleans Parish Property Owners/Lessees/Occupants**

a.  Petitioner, **Anthony J. Stewart**, is a person of full age of majority, domiciled in the Parish of Orleans, State of Louisiana.

b.  Petitioner, **Tomika Jordan**, is a person of full age of majority, domiciled in the Parish of Orleans, State of Louisiana.

c.  Petitioner, **Sheena Altine**, is a person of full age of majority, domiciled in the Parish of Orleans, State of Louisiana.

d.  Petitioner, **Roslyn Robert**, is a person of full age of majority, domiciled in the Parish of Orleans, State of Louisiana.

e.  Petitioner, **Phyllis Banks**, is a person of full age of majority, domiciled in the Parish of Orleans, State of Louisiana.

f.  Petitioner, **516 St. Philip, LLC** is a Louisiana limited liability company licensed to do and doing business in the State of Louisiana, with its principal place of business in Orleans Parish.

g.  Petitioner **William A. Myers, Jr.,** is a person of full age of majority, domiciled in the Parish of Orleans, State of Louisiana

h.  Petitioner **George Alvin Bouie d/b/a Wilson's Shoe Repair, LLC** is a Louisiana limited liability company licensed to do and doing business in the State of Louisiana, with its principal place of business in Orleans Parish.

i.  Petitioner **Vera Warren Williams d/b/a Community Book Center, LLC** is a Louisiana limited liability company licensed to do and doing business in the State of Louisiana, with its principal place of business in Orleans Parish.

j.  Petitioner, **James Raley,** is a person of full age of majority, domiciled in the Parish of Orleans, State of Louisiana.

k.  Petitioner, **Colleen Raley,** is a person of full age of majority, domiciled in the Parish of Orleans, State of Louisiana.

l.  Petitioner, **Janet Kalanet,** is a person of full age of majority, domiciled in the Parish of Orleans, State of Louisiana.

m.  Petitioner **Matador, LLC d/b/a Val's,** is a Louisiana limited liability company licensed to do and doing business in the State of Louisiana, with its principal place of business in Orleans Parish.

n.  Petitioner **We The People, LLC d/b/a Cain and Table,** is a Louisiana limited liability company licensed to do and doing business in the State of Louisiana, with its principal place of business in Orleans Parish.

o.  Petitioner **Cure, LLC d/b/a Cure,** is a Louisiana limited liability company licensed to do and doing business in the State of Louisiana, with its principal place of business in Orleans Parish.

4.

**Jefferson Parish Property Owners/Lessees/Occupants**

a.  Petitioner, **Tyelga J. Kearney,** is a person of full age of majority, domiciled in the Parish of Jefferson, State of Louisiana.

b.  Petitioner, **Diane Raley,** is a person of full age of majority, domiciled in the Parish of Jefferson, State of Louisiana.

c.  Petitioner, **Jason C. Tullos,** is a person of full age of majority, domiciled in the Parish of Jefferson, State of Louisiana.

d.  Petitioner, **Randolph H. Gonzales, Jr**., is a person of full age of majority, domiciled in the Parish of Jefferson, State of Louisiana.

e.  Petitioner, **Chrishante Ruffin,** is a person of full age of majority, domiciled in the Parish of Jefferson, State of Louisiana.

3

  f. Petitioner, **William A. Myers, III,** is a person of full age of majority, domiciled in the Parish of Jefferson, State of Louisiana

  g. Petitioner, **Keith Gelpi,** is a person of full age of majority, domiciled in the Parish of Jefferson, State of Louisiana.

  h. Petitioner, **Lexie Keys,** is a person of full age of majority, domiciled in the Parish of Jefferson, State of Louisiana.

  i. Petitioner, **Bailey Keys,** is a person of full age of majority, domiciled in the Parish of Jefferson, State of Louisiana.

  j. Petitioner, **Larry Guillory,** is a person of full age of majority, domiciled in the Parish of Jefferson, State of Louisiana.

  k. Petitioner, **Shelley Guillory,** is a person of full age of majority, domiciled in the Parish of Jefferson, State of Louisiana.

  l. Petitioner, **Andrew Cassara,** is a person of full age of majority, domiciled in the Parish of Jefferson, State of Louisiana.

5.

Made defendants are the following parties:

  **a. Entergy Corp.,** a Louisiana Corporation licensed to do and doing business in the State of Louisiana, with its principal business office at 639 Loyola Ave., New Orleans, LA 70113, and with its registered agent, Marcus V. Brown, 639 Loyola Ave., 28th Floor, New Orleans, LA 70113.

  **b. Entergy New Orleans, LLC**, a Louisiana Corporation licensed to do and doing business in the State of Louisiana, with its principal business office at 1600 Perdido St., New Orleans, LA 70112, with its registered agent Marcus V. Brown, 639 Loyola Ave., 28th Floor, New Orleans, LA 70113.

  **c. Entergy Louisiana, LLC**, a Louisiana Corporation licensed to do and doing business in the State of Louisiana, with its principal business office at 4809 Jefferson Hwy, Jefferson, LA 70121, and with its registered agent John A. Braymer, 446 North Blvd., Baton Rouge, LA 70802.

## VENUE

6.

This Court has venue pursuant to Louisiana Code of Civil Procedure article 42(2) because two of the defendants have their principal place of business in this Parish. Venue is also proper pursuant to La. Code of Civil Procedure art. 73(a) because the defendants are solidary obligors. Further, on information and belief, the conduct and decisions made resulting in the damages claimed occurred in this Parish, making venue proper under La. Code of Civil Procedure art. 74.

7.

## THE STORY

Entergy is a holding company founded in 1913. It provides power to the citizenry it serves. Entergy's 40 electric power plants are located in 12 states, including Louisiana. The plants produce 30 billion watts of electricity and provide services to 3 million customers in 4 states, including Entergy's home state, Louisiana. Entergy provides electric service to 1.1 million Louisiana customers, or almost 25% of Louisiana's entire population, in 53 of 64 parishes, over a geographic area of 114 thousand square miles, an area larger than all but 5 states in the United States of America.

8.

Entergy is a member of the exclusive Fortune 500 club, being larger than U.S. Steel, Norfolk Southern Railway, and the Coors Beverage Corporation, with a total of $50,000,000,000 in assets and an annual income of $11,000,000,000.

9.

When Entergy first chose to apply for and become the sole power provider in 53 Parishes, it was well aware that it was going to be responsible for maintaining a system and its components, and that the system and its components would be required to sustain repeated exposure to extreme weather conditions, and also that the entirety of their transmission system would on occasion be severely tested by weather. In the process of securing and maintaining the privilege of having the exclusive right to service these customers, Entergy repeatedly assured the State and other public entities that it was up to the job. This job of providing reliable energy would have to face numerous and regular tropical storms and hurricanes. To accomplish this, the equipment, poles, lines, and transmission equipment would require that it be well-maintained and regularly surveyed

(repaired/replaced) for any possible conditions that could plummet Louisiana into darkness and idle the functioning of other necessary systems, such as pumps and sewerage.

10.

Historically, Louisiana has faced at least two tropical storms every three years and one full blown hurricane every 2.8 years. However, Entergy, along with most of the world, has become aware that the climate of the world (including southeast Louisiana) is changing, and not for the better. In 2020, alone Louisiana faced four category 2 to 4 hurricanes, and one severe tropical storm. Entergy also knows that besides the wind events, Louisiana experienced more severe periods of heat and flooding. Entergy's job is to protect the delivery of their product (electricity), a job that, because of its government monopoly and lack of competition, requires regular and keen diligence on its part. Where Entergy has many choices on how to conduct its business, and most especially its decision to service southeast Louisiana, Petitioners have no choice, they must accept what Entergy delivers.

11.

In the case of Hurricane Ida, Entergy, through its grossly inadequate maintenance and inspection program, failed miserably in that obligation by using antiquated equipment, shoddy maintenance, and lies to the City, the State, and its customers. Entergy created a system that could not and would not sustain even a hurricane with wind gusts below 100 miles per hour. As noted by the Defendants in their answer at paragraph 100, "the 2007 National Electric Safety Code requires certain structures along the Louisiana coast with a height of more than 60 feet above ground or water level to be designed to withstand an extreme wind load associated with wind speeds of 140 mph."

12.

Entergy's greed and lies set the foreseeable stage for hundreds of thousands of people to be left without refrigeration, air conditioning, and in many cases sewerage disposal. Entergy's negligence also led to thousands of people not only sitting without lights but unable to learn what the storm and electric failure wrought. Thousands of people suffered and suffer unnecessarily because of Entergy's failure to do what they promised to do. As Louisiana Civil Code article 2315 provides "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

6

**FACTS**

**Entergy what it is and what it is responsible for**

13.

Entergy has contracts or implied contracts with its customers which are subject to regulation by the Public Service Commission and the City of New Orleans, and it owes duties to those customers and also to third-party beneficiaries (stipulations *pour autri*) to these contracts or implied contracts, (*i.e.,* residents of hospitals, healthcare facilities, nursing homes, customers' dependents, and other residents who are not the named individual on the Entergy billing statements).

14.

Entergy designed and constructed, and owns and operates, the Entergy transmission system (the "Transmission System") that provides electricity to Southeast Louisiana.

15.

The Transmission System generates and delivers power to citizens, businesses, government agencies, healthcare facilities, universities, and others.

16.

The Entergy Transmission System is a utility system that generates and moves high voltage bulk electric power from generating plants of the Entergy Operating Companies (including Entergy New Orleans, LLC ("ENO") and Entergy Louisiana, LLC ("ELL")) in their system of distribution lines, transmission lines, and substations.

17.

Entergy Corp. wholly owns a number of subsidiary companies, including ENO and ELL, which are businesses designed to profit from, inter alia, the provision, transmission, sale, and trading of electricity, as well as fuel used to generate electricity. As the corporate parent, Entergy Corp. has, and exercises, control over all aspects of the Transmission System. Entergy Corp. also exercises complete domination and control over ENO and ELL's management, finances, policy, and business practices, including the provision of and purchase, sale, and resale of electricity, rendering ENO and ELL under the control of Entergy Corp.

18.

ELL was formed by a 2015 merger of Entergy Gulf States Louisiana, LLC and Entergy Louisiana, LLC.

7

19.

All of ELL and ENO's common LLC interests are owned by Entergy Utility Holding Company, LLC, an intermediate holding company, all of whose common LLC interests are owned, directly or indirectly, by Entergy Corp.

20.

Entergy Corp. also owns all of the common stock of Entergy Services, LLC.

21.

As a result of numerous interlocking directorships and office holdings, Entergy Corp., the parent company, through its officers and directors, completely controls and dominates ENO and ELL's operations, management, budget, financing, policy, and business decisions. ENO and ELL are under the sole control of Entergy Corp. Entergy Corp. has working control over ENO and ELL.

22.

ENO and ELL's officers and directors are also officers and directors of the parent corporation and each other. For example, key executives and directors of Entergy Corp. also manage and direct ENO and ELL, including Roderick West (Group President, Utility Operations of Entergy Corp., who is Director of ELL and Chairman, President, CEO, Utility Operations, and Director of ENO); Andrew Marsh (Executive Vice-President and CFO of Entergy Corp., and Executive Vice-President, CFO, and Director of ELL and Director of ENO); and Paul Hinnenkamp (Executive Vice-President and COO of Entergy Corp. and Director of ELL and Director of ENO).

23.

Entergy Corp.'s domination and control of ENO and ELL has caused ENO and ELL to not be operated as separate entities, and instead to be operated as an alter ego and agent. They have been found to be a single business enterprise and should be treated as such as to all legal obligations and duties.

24.

Tax documents filed by Entergy Corp., ENO, and ELL, as well as Entergy's website and other Entergy documents confirm that all three have headquarters and principal places of business in Louisiana.

25.

Entergy Corp.'s bylaws indicate that its principal business office shall be in New Orleans, Louisiana.

8

26.

ELL's Company Agreement indicates that its principal place of business is in Jefferson, Louisiana.

27.

ENO's Company Agreement indicates that its principal place of business is in New Orleans, Louisiana.

28.

Entergy Corp.'s control and oversight of ENO and ELL was performed negligently, leading to the damages at issue in this lawsuit.

29.

ELL serves over one million electric and gas customers in 58 Louisiana parishes.

30.

ENO is an electric and gas utility serving Orleans Parish.

31.

ENO's slogan is "keep the lights on and the gas flowing."

32.

As of 2013, ENO has had about 6,000 direct and indirect employees in the New Orleans area.

33.

As of about 2013, ELL has had about 4,500 employees in Louisiana.

34.

Entergy's Code of Ethics provides that Entergy Representatives shall comply with all laws, rules, and regulations. The purpose of the code is to, in part, foster a culture of honesty, accountability, and mutual respect. The Code notes that Entergy Representatives have a responsibility to act honestly and transparently with customers and to treat customers with fairness and respect.

35.

Entergy's Code of Ethics does not mention the public good, public safety, or public health.

36.

Until 2015, transactions among ENO and ELL were governed by a System Agreement, which sought to iron out inequities among the Entergy Corp. operating companies through

"equalization payments." The System Agreement governed energy exchange transactions between the Entergy Operating Companies, providing the basis for planning and operating generation and bulk transmission facilities on an integrated, single-system basis. It also traditionally provided for the joint planning and sharing of transmission and generation infrastructure and related costs. The System Agreement was administered by an Operating Committee that included the operating companies' CEOs and Entergy Corp.'s CEO. Entergy Corp., through its CEO, had the highest percent of vote for the Operating Committee.

37.

The System Agreement was terminated in 2016.

38.

The Entergy system, including Entergy Corp., ENO, and ELL, were and are highly integrated, with the transmission and generation facilities operated as a single electric system. The System Agreement helped ensure that the operating companies were operated as a single, integrated, and coordinated system.

39.

Entergy operating companies, including ENO and ELL, jointly own certain transmission control centers, which are governed by a Joint Ownership and Operating Agreement. The control centers are operated and maintained by Entergy Services, LLC. Entergy Services, LLC operates pursuant to centralized service company agreements with ENO and ELL.

40.

Entergy has internal standards which guide its decision on how to design and build its structures, namely, the Entergy Design Standards for site design.

41.

Entergy has spent a disproportionate amount of its resources generating its own electricity rather than operating, maintaining, and fortifying the transmission grid. This is not typical within the industry. Entergy does this in an effort to maximize profits at the expense of protecting Louisiana residents.

42.

Since about 2016, it has continued to obstruct, and try to delay and stop regional planning so that regional lines do not get built.

**The Laws, Regulations, and Rules Entergy Must Abide**

43.

Entergy is subject to the rules and regulations of the Louisiana Public Service Commission and the City of New Orleans, among other state and local entities and agencies.

44.

"The avowed purpose of the NESC is to provide basic guidelines for safeguarding persons from hazards arising from the installation, operation, or maintenance of overhead electric supply lines, and its requirements reflect the minimum provisions considered necessary for the safety of employees and the public." *Foley v. Entergy La., Inc*., 06-0983 (La. 11/29/06), 946 So. 2d 144, 159.

45.

Standards within the applicable edition of the Department of Transportation and Development standards also apply to Entergy.

46.

Entergy is also mandated to adhere to local standards, including but not limited to:

a)  City Ordinance 158-892 ("Repairs to be made") provides that "All companies shall make necessary repairs to their lines of conductors. The permit to make such repairs does not, however, cover the erection in any street, alley or public place of any additional poles, wires, fixtures or similar structures."

b)  City Ordinance Chapter 158, Division 2, at Section 158-1044, et seq. is the "Bill of Rights" that provides ratepayers with certain rights. This includes the "right to safe and reliable service in accordance with industry standards." See Section 158-1045.

47.

Entergy is also bound by several provisions of the Louisiana Civil Code including but not limited to articles 2315, 2317, and 2322.

47a.

Defendants' own internal rules and internal standards are standards the violation of which constitute negligence.[1] For example, since Hurricane Betsy in the 1960s, Entergy's own internal

---

[1] *Carmouche v. Entergy Louisiana, LLC*, No. 09-1474, 2011 U.S. Dist. LEXIS 9919WL 400312, at *4 (W.D. La. Feb. 1, 2011).

rules and internal standards call for its system to withstand windspeeds of 140 mph.[2] The collapse of Entergy's power grid during Hurricane Ida evidences a violation of these standards.

47b.

Industry standards and national (non-federal) standards are also standards the violation of which constitute negligence. Entergy's own Resiliency Plan provides that IBC (International Building Code) and ASCE 7 (American Society of Civil Engineering—Minimum Design Loads for Buildings and other structures) standards apply.[3] NESC standards are the most directly applicable here.[4] The collapse of Entergy's power grid during Hurricane Ida evidences a violation of these standards.

47c.

The Louisiana state-law "reasonableness" of a utility's actions is another standard the violation of which constitutes negligence.[5] The decision not to repair or replace the Avondale Tower prior to Hurricane Ida, despite the clear age and dilapidated condition of the tower, evidences that Entergy violated the state-law "reasonableness" standard.

**Entergy was on Notice of Serious Systemic Deficiencies in its Systems**

48.

After the devastating 2005 and 2008 hurricane seasons, in 2010, the U.S. Department of Energy, issued a study ("Hardening and Resiliency: U.S. Energy Industry Response to Recent Hurricane Seasons"). The study focused on "aging infrastructure and hurricane hazards." The

---

[2] Entergy Corporation, Entergy's Resiliency Plan at *5 (Dec. 2016) (https://cdn.entergy.com/userfiles/content/environment/docs/Resilience_Plan.pdf ).
[3] Entergy Corporation, Entergy's Resiliency Plan at *5 (Dec. 2016) (https://cdn.entergy.com/userfiles/content/environment/docs/Resilience_Plan.pdf ).
[4] *Foley v. Entergy Louisiana, Inc.*, 06-0983 (La. 11/29/06), 946 So. 2d 144, 159; see also *Hayes v. Entergy Corp.*, 37,190 (La. App. 2 Cir. 6/25/03), 850 So. 2d 916, 919 (negligence established by non-compliance with NESC, or by showing that "Entergy did not have knowledgeable employees that conducted meaningful inspections of the electrical lines," leading them to fail to discover and correct a problem); *Davis v. Louisiana Power & Light Co.*, 612 So.2d 235, 237 (La. Ct. App. 1992) (in which the court considered a utility's negligence based on whether the utility had proper clearances consistent with industry standards of the NESC); *Burley v. Louisiana Power & Light,* 319 So.2d 334, 336, 338 (La. 1975) ("We do not agree that no probative weight could be given to the National Electric Safety Code," and "the National Electric Safety Code has often been received in evidence and given probative weight by the courts of this State").
[5] *Hayes v. Entergy Corp.*, 37,190 (La. App. 2 Cir. 6/25/03) 850 So.2d 916, 922 (Entergy has a duty "to guard against reasonably foreseeable hazards."); *Foley v. Entergy La., Inc.*, 946 So.2d 144, 158 (La. S. Ct. 2006); *Aucoin v. Louisiana Power & Light Company*, 490 So.2d 1088, 1089-1090 (La. Ct. App. 1986) ("Although mere compliance with safety standards does not, per se, preclude the finding of negligence, the determination of compliance vel non does shed light on the question of foreseeability. In addition, it was pointed out in the case of *Hebert v. Gulf States Utilities Company*, 426 So. 2d 111 (La. 1983), that initial compliance with the safety standard does not relieve a public utility from keeping abreast of significant changes in circumstances and from taking measures when unreasonable risks are discovered."); *Pillow v. Entergy Corp.*, 36,384 (La. App. 2 Cir 09/18/02), 828 So.2d 83, 90; *Williams v. New Orleans*, 433 So.2d 1129 (La. Ct. App. 1983) (considering expert testimony under the NESC, and noting that a public utility "has a duty to use reasonable care in the installation, operation and maintenance of their electric lines, and will be responsible for any conduct falling short of this standard. NOPSI must provide protection which safely guards against any contingency that can be reasonably Anticipated"); *Hebert v. Gulf States Utils. Co.*, 426 So.2d 111, 115–16 (La. 1983) (duty to take reasonable measures to ensure workers were able to work without unreasonable risk of harm).

study noted that "aging infrastructure is more susceptible than newer assets to the hurricane-related hazards" of, for example, "extreme winds." The study noted that electric utilities have invested in construction projects, but that the investments "are limited by comparison with the level of effort required for wind protection."

49.

This 2010 study was directed in part to Entergy's transmission system in Southeast Louisiana and put Entergy on notice of the susceptibility and likelihood of their equipment to fail.

50.

According to the Washington Post (8/31/2021), "ENTERGY, the power provider for 3 million customers in the Gulf region, has over the past decade been fined for deferring maintenance of its aging infrastructure and criticized for moving too slowly to reinforce its grid against severe weather. The company resisted calls to increase investments in renewable energy sources, which climate     advocates     see     as     a     way     to     prevent     widespread     outages." https://www.washingtonpost.com/business/2021/08/31/ida-entergy-hurricane-louisiana-power/

51.

In 2007 and in direct response to the 2005 Hurricanes Katrina and Rita, Entergy performed a "Hardening Study." This study provided Entergy sufficient information needed to develop strategies to harden its infrastructure for Southeast Louisiana.

52.

Hardening refers to physically changing the infrastructure to make it less susceptible to damage from extreme wind, flooding, or flying debris. Hardening improves the durability and stability of energy infrastructure, making it better able to withstand the impacts of hurricanes and weather events without sustaining major damage. Resiliency, by contrast, refers to the ability of an energy facility to recover quickly from damage to any of its components or to any of the external systems on which it depends. Resiliency measures do not prevent damage; rather they enable energy systems to continue operating despite damage and/or promote a rapid return to normal operations when damages/outages do occur.

53.

The 2007 Hardening Study also showed Entergy that it needed to support coastal transmission lines with concrete and steel poles, rather than wood poles[6].

---

[6] The study was particularly critical of the high-capacity tower

54.

On information and belief, Entergy did not comply with its 2007 Hardening Study.

55.

On September 9, 2021, Entergy CEO Phillip May, publicly warranted and assured the state categorically that newly built and restored towers and wires and strengthened substations are engineered to withstand 150 mph winds. https://www.wwltv.com/article/news/investigations/david-hammer/regulators-question-entergys-transmission-upgrades-after-catastrophic-failure/289-757c5b6d-fa64-4c65-9015-bdce5cbc1fd0

56.

According to a 2016 Entergy "Resilience Plan", Entergy began "hardening" transmission lines against storms in the 1960s. Also, Entergy allegedly reinforced equipment to withstand winds of up to 140 mph, the speed of Hurricane Betsy's strongest winds, which Entergy noted is "well beyond the National Electrical Safety Code (NESC) requirements." The study noted that "Entergy's primary acute vulnerability is to extreme weather events that result in outages." However, Entergy had no adequate redundancy system capable of rerouting electricity effectively and immediately.

57.

According to the 2016 Resilience Plan, "During the design phase, wind loading on structures is in accordance with IBC (International Building Code) and ASCE 7 (American Society of Civil Engineering—Minimum Design Loads for Buildings and other structures) standards. ASCE 7 provides users with site-specific wind speeds used in the determination of the design of wind loads for the buildings and structures. ASCE 7 also addresses design loads for seismic, rain, and ice impacts. The IBC addresses the design and installation of building systems and provides regulations that safeguard the public health and safety in all communities, large and small."

58.

In 2015, a decade after Katrina, the New Orleans City Council complained that Entergy had yet to provide the Council with "a comprehensive, detailed storm hardening plan," including detailed costs, a timeline, and benefits.

59.

Entergy recently cut $150 million in "O&M" (Operations and Maintenance) expenses, which includes, among other things, poles, and upkeep of substations.

60.

During a 2018 City Council meeting, an Entergy executive admitted to deliberately reducing the company's investment in the power grid by about $1 million, because, she said, the company was seeing strong performance and "we didn't want to spend money on a system that was performing extremely well," according to notes included in a City Council report.

61.

According to the City Council report, the "slight drop" in funding was responsible for an increase in customer power outages from 2013 to 2017. In 2019, the City fined Entergy $1 million after finding that it had failed to properly maintain electricity poles and wires following a series of power failures from 2014 to 2017 and asked it to increase investments in the grid.

62.

In 2018, Entergy revealed that broken equipment caused between 73 and 81 percent of power outages in each of the past five years. Those outages followed Entergy's 2013 decision to raid $1 million from a pool of money slotted for repairs, which Entergy vice president for customer service Melonie Stewart indicated was because the distribution system at that time was "outstanding." Ms. Stewart said, "We didn't want to spend money on a system that was performing extremely well." "But as we backed off from that funding, we did see the reliability go in the wrong direction."

63.

Before Hurricane Ida hit Southeast Louisiana, it was Entergy's position that its systems, which provided power to 1.1 million residents and businesses, could withstand winds of 150 mph. Entergy was wrong in this opinion and the studies presented to it and studies in which it participated. These studies provided sufficient information for Entergy to know and understand that its beliefs about the strength of its system and its component parts would likely fail at wind speeds significantly lower than 150 mph.

**Hurricane Ida**

64.

Hurricane Ida was first monitored as a storm by the National Hurricane Center on August 23, 2021.

65.

On August 26, 2021, it became known as Tropical Depression Nine.

66.

On August 26, 2021, it morphed into Tropical Storm Ida.

67.

On August 27, 2021, it strengthened into Hurricane Ida ("Ida").

68.

On August 28, 2021, Ida underwent a rapid intensification due to warm sea surface temperatures.

69.

On August 29, 2021, Ida made landfall near Port Fourchon, Louisiana.

70.

The weather station at Louis Armstrong International Airport in New Orleans reported a sustained wind speed of 64 mph and a wind gust of 90 mph.

71.

The National Weather Service measured wind speeds in Waggaman, finding maximum wind gusts of 92 mph. Hurricane Ida's known peak wind gust recorded in the City of New Orleans was 90 mph, all of these wind gusts were significantly below the purported 150 mph rating for their towers.

72.

Entergy estimates that there were about 950,000 outages of electrical services after Ida made landfall.

73.

On September 1, 2021, Entergy estimated that as of August 31, 5,112 poles, 5,906 transformers, and 1,185 spans of wire were damaged or destroyed, with further damage assessment ongoing.

74.

Entergy announced that more than 2,000 miles of transmission lines were out of service, along with 216 substations.

75.

Entergy announced that there was damage to eight high-voltage lines that took out power for New Orleans and Jefferson, St. Bernard, and Plaquemines parishes, as well as parts of St. Charles and Terrebonne parishes.

16

76.

Because the Sewerage and Water Board of New Orleans ("SWB") relies on Entergy to run its 84 sewer lift stations, and because Entergy's transmission line failures caused a power outage, SWB was forced to pump raw sewage into the Mississippi River. This continued through September 6, 2021.

77.

The 400-foot-tall transmission tower with transmission lines over the Mississippi River to the New Orleans area (hereinafter, the "River Tower" or "Avondale Tower") catastrophically collapsed, and its conductor landed in the Mississippi River, causing widespread outages. This line was carrying 800,000 watts of electricity, which was not adequately protected from storms.

78.

The River Tower/Avondale Tower is located in Avondale/Bridge City area on River Road at approximately Lat/Long 29.928444499210215, -90.17900987736854.

79.

The River Tower delivers power from the Waterford power plants on the West Bank of St. Charles Parish through Avondale to Harahan on the East Bank

80.

According to Entergy, the River Tower passed inspections and was deemed to have no structural issues, and did not need any upgrades, as recently as December 2020. Obviously, the inspection was flawed.

81.

Prior to Ida, Entergy CEO Phillip May stated, "That [River Tower] was very robustly engineered." "We're not going to go in and proactively replace a tower like that. I mean, that is an enormously expensive engineered structure."

82.

The River Tower either was not constructed pursuant to "industry practice" and not have guide wires to strengthen the tower from extreme winds, or it did not have guide wires that were sufficiently strong to prevent the tower's collapse. Obviously, Entergy has not done appropriate study and analysis of the tower, including the steel's integrity, which has been repeatedly subjected to severe stresses, such as Hurricane Katrina in 2005.

83.

In addition to the River Tower, the seven other transmission towers also failed, and according to Entergy, the cause was wind damage to twelve of the 1,500 poles or towers that carry those seven lines. Seven of those twelve structures (poles or towers) were destroyed, and five others were damaged. All of which speaks to the inadequacy of Entergy's inspections and maintenance programs.

84.

On information and belief, the New Orleans Sewage & Water Board relies on Entergy and backup generators to keep the drainage pumps operational. But the failure of the Entergy Transmission System, as well as the failure of the backup generator on the Westbank, led to the inability to pump water out of the Algiers neighborhoods, resulting in the flooding of that part of New Orleans.

**The 9th Ward, the French Quarter, and the CBD**

Entergy built a $210 million, 128-megawatt, natural gas-fired plant (the "New Orleans Power Station" or "NOPS") in New Orleans East.

85.

In 2017, Entergy argued in favor of construction of NOPS, in part, by arguing that it would help provide energy if the city became "electrically islanded" from the rest of the interconnected transmission grid, as it was after Hurricane Gustav."

86.

In 2018, Entergy paid actors from $60 to $200 each to go to New Orleans City Council meetings and pretend to support construction of NOPS. For Entergy's fraud, the city council of New Orleans fined Entergy $5 million. https://readersupportednews.org/news-section2/318-66/49935-actors-were-paid-to-attend-new-orleans-city-council-meetings-supporting-power-plant

87.

NOPS purportedly became operational in May 2020.

88.

NOPS was purportedly designed with a "black start" capability, to allow the plant to be operated even if disconnected from the national power grid. NOPS independently was supposed to have the ability to power about 10% of the City of New Orleans' energy needs.

89.

After Hurricane Ida passed through southeast Louisiana, NOPS sat idle and undamaged.

90.

NOPS was not in use until September 1, 2021, at which point it only served a small section of the New Orleans East.

91.

The failure to activate or turn on NOPS resulted in portions of the City of New Orleans not having power for several days. Those within the NOPS grid were specifically damaged as a result of this failure.

92.

On September 4, 2021, Entergy restored three of the eight transmission lines, bringing the restoration total to six of the eight transmission lines. As of that day, the two transmission lines that were supposed to go the River Tower remained down.

93.

Ironically, Entergy is seeking to charge customers to cover $2.4 billion in power restoration costs for 2020 storms that affected Louisiana, including Hurricanes Laura, Delta, and Zeta. No one yet knows what Entergy will charge its customers for its costs resulting from its failure to properly harden and maintain its systems following Hurricane Ida.

94.

As a result of the failure of Entergy's Transmission System, Plaintiffs have suffered significant damages. Entergy was well aware that the failure of its Transmission System would result in a disaster, including the inability to supply power to their customers and the Sewerage and Water Board. Entergy was also well aware that the failure of the Transmission System would result in its customers suffering damages, including but are not limited to:

a) Emotional distress, mental anguish, physical fear, and fright;

b) Loss of habitation and the cost of relocation and other costs associated with having to live outside of their home;

c) Growth of mold and mildew inside of their home and the restoration thereof;

d) Physical injury resulting in the loss of electricity, particularly to those people unable to leave their home; and

e) Wrongful death of 10+ individuals who perished as a result of the power outage as of the date of this filing.

(These damages can be addressed in subclasses subsequent to the trial of liability of all parties.)

95.

Many of the citizenry serviced by Entergy were required to evacuate and find other accommodations as far away as Atlanta, St. Louis, Houston, and other cities of equal distance, or to endure the horrors of living without electricity and being cut off from the rest of the world, without the ability to cook, work and/or maintain their business, all in an environment without air conditioning.

96.

Petitioners have incurred and will continue to incur substantial costs in response to the failure of the Transmission System, as well the other costs which will be proven at the trial of this matter.

97.

Based on past experiences, it was clearly foreseeable that Entergy's equipment and Transmission System would be required to endure and survive a storm of the magnitude of Ida or greater.

98.

It is beyond dispute that Entergy was aware of the foreseeability of a storm like Ida or greater, which could hit its serviced area in Louisiana. Knowing this, Entergy consciously chose not to design, install, construct, operate, inspect, and maintain its Transmission System as a reasonable electric supplier/producer.

99.

Upon information and belief, the applicable design standards were not met nor did the Defendants properly maintain these structures and installations.

100.

National Electrical Safety Code (NESC) changes in 2007 required structures (like the Entergy towers) to withstand 140 mph winds along the Louisiana coast.

101.

Entergy failed to adhere to minimum standards of the Louisiana Department of Transportation and Development.

102.

Entergy failed to adhere to local standards in the following non-exclusive ways:

a) City Ordinance 158-892 ("Repairs to be made") provides that "All companies shall make necessary repairs to their lines of conductors. The permit to make such repairs does not, however, cover the erection in any street, alley or public place of any additional poles, wires, fixtures or similar structures."

b) City Ordinance Chapter 158, Division 2, at Section 158-1044, *et seq*. is the "Bill of Rights" that provides ratepayers with certain rights. This includes the "right to safe and reliable service in accordance with industry standards." *See* Section 158-1045.

**Causes of Action**

103.

Even if Entergy adhered to the statutory standards, Entergy was nevertheless negligent in the following non-exclusive ways:

a. Failure to use reasonable care to keep the transmission towers, including the Avondale Tower, and power lines in a safe condition;

b. Failure to properly design, construct, and install its Transmission System, including but not limited to, distribution and/or transmission towers and power lines;

c. Failure to properly inspect its Transmission System, including but not limited properly/adequately to, distribution and/or transmission towers and power lines;

d. Failure to establish proper procedures for inspection and maintenance of the Transmission System, including but not limited to, its equipment, including the towers and power lines;

e. Failure to implement and follow those proper procedures listed above;

f. Failure to maintain and repair its Transmission System, including but not limited to, distribution and/or transmission towers and power lines;

g. Failure to warn the public, including Plaintiffs, of the dangerous condition of the Transmission System, including but not limited to, towers and power lines;

h. Failing to discover or repair the River Tower and other aspects of the Transmission System;

i.   Acting in a careless and negligent manner without due regard for the safety of others;

j.   Failing to use due care and caution under the existing circumstances;

k.   Considering the admonitions, warnings, and sanctions given to Entergy, Entergy should have warned the public of the damages that could result from its failure to comply or act on the warnings admonitions and sanctions; and

l.   Any and all other acts of negligence by Entergy and/or its employees, agents, and representatives which may be discovered between now and the time of the trial of this matter.

104.

Petitioners plead the doctrine of strict liability asserting that Entergy, as the transmission system, towers, and power lines owners and custodians, knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect, in the lines which caused the widespread outages in southeast Louisiana, and that the damage could, and would, have been prevented by the exercise of reasonable care.

105.

Entergy is strictly liable for the causes of widespread outages and corresponding damages.

a)   Entergy is the owner/custodian of the Transmission System;

b)   It was within the sole discretion of Entergy, to properly construct, inspect, repair, replace, or maintain the Transmission System that is the subject of this Litigation;

c)   The widespread outages were caused by a ruin, vice, or defect in the power lines;

d)   Entergy unquestionably should have known of the defective condition of its Transmission System; and

e)   Entergy obviously failed to exercise reasonable care and vigilance.

106.

The actions of Entergy were willful violations of applicable safety standards and statutes in its failure to do proper testing, maintenance, and inspection procedures on the Transmission System and, as a result, Entergy's conduct constituted negligence *per se*.

107.

In addition to the negligence stated above, and in the alternative thereto, the injuries and damages suffered by the Plaintiffs and others were caused by acts and omissions of Entergy, which acts, or omissions may be beyond proof by the Petitioners, but which were within the knowledge and control of Entergy, there being no other possible conclusion than that the failure of the Transmission System resulted from the negligence of Entergy. The damage and injuries would not have occurred had Entergy exercised the requisite degree of care for management of a Transmission System in this location, and the Petitioners therefore plead the doctrine of *res ipsa loquitur.* Simply put, the fact that all eight towers failed in the face of wind clearly 1/3 or 50mph below the maximum wind speed that the president of Entergy guaranteed the public that these towers would sustain, speaks of a gross lack of observation, maintenance, and repairs on Entergy's part.

108.

Entergy breached its express and implied contracts.

109.

The widespread outages and corresponding damages were caused by the negligence and strict liability of Entergy and/or its agents, employees and assigns for all reasons stated herein, and all without any negligence on behalf of the citizens of Southeast Louisiana.

**Class Allegations**

110.

This is an issue-based class action brought pursuant to La. C.C.P. art. 591, *et seq.*.

111.

It is Plaintiffs' intent to file this lawsuit invoking the local controversy exception of CAFA, 28 U.S.C. § 1332(d)(4)(A), and to proceed under the local controversy exception.

112.

The common issue is Entergy's liability for its negligence and other breaches outlined above resulting in its failure to supply electricity to their customers, some of whom remain without power today, as of the date of the original filing. The issue-based class is manageable in as much as the issue of liability can be tried to one jury. And once Entergy's liability is determined, the Court may maintain subclass(s) for individual damages (including wrongful death) which then could be tried by this Court in groups with specific commonality, typicality, and numerosity.

113.

Until a more precise determination is made, the Plaintiffs allege that the class consists of the following: (1) all persons who (a) are customers of ENO and ELL or depend on the customers' receipt of electricity, (b) lost electricity as a result of, or associated with, Hurricane Ida, (c) are Louisiana citizens for purposes of diversity jurisdiction, and (d) are domiciled in Orleans Parish or on the East Bank of Jefferson Parish; and (2) all businesses who (a) are customers of ENO and ELL, (b) lost electricity as a result of, or associated with, Hurricane Ida, (c) are Louisiana Corporations or Louisiana entities, and (d) have physical operations in Orleans Parish or on the East Bank of Jefferson Parish that were affected by the loss of electricity as a result of, or associated with, Hurricane Ida.

114.

This action is appropriate for determination through the Louisiana Class Action Procedure (La. C.C.P. Art. 591, *et seq.*) for the following reasons:

a) The substantial number of potential claimants present a level of numerosity better handled through the class action procedure as opposed to a mass joinder of individual claims;

b) The common issues of law and fact pertaining to the determination of fault and the liability for compensatory damages predominate over the individual issues of quantum;

c) The determination of fault may be made in the class action under the provisions of La. C.C.P. art. 592.1(C)(1), (2) & (3) without the necessity of proof at that time as to the amount of those damages, thereby establishing guidelines for settlement and/or subsequent trials in individual cases if necessary; thereby simplifying and expediting the resolution of this matter.

d) Petitioners herein have sustained damages of the nature described hereinabove and are suitable representatives of the class (subclasses);

e) The plaintiff representatives herein are represented by skilled attorneys who are experienced in the handling of mass tort class actions of this type[7] and who may be expected to handle this action in an expeditious and economical manner to the best interests of all the class membership; and

f) The Louisiana Class Action Procedure affords a superior vehicle for the efficient disposition of the issues and claims herein presented, especially in situations such as this where

---

[7] *In re: New Orleans Train Car Leakage Fire Litigation.*

the number of claimants may exceed numbers that would exhaust the resources of this Court and protract litigation over many years.

115.

Greater than two-thirds of the members of the proposed class in the aggregate are citizens of Louisiana.

116.

Each of the three defendants are defendants from whom significant relief is sought by members of the plaintiff class, whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class, and who are citizens of Louisiana.

117.

All the conduct of Entergy complained of herein and resulting damages occurred in Louisiana. No claim is made under any federal law.

118.

On information and belief, during the three-year period preceding the filing of this class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons.

119.

Excluded from the Class are:

a) the officers and directors and employees of the Defendants;

b) any judge or judicial officer assigned to this matter and his or her immediate family;

c) any legal representative, successor, or assign of any excluded persons or entities;

d) any persons who are non-residents of Louisiana;

e) any persons who are non-citizens of Louisiana and

f) any person or business that is not domiciled in the State of Louisiana, so as to maintain jurisdiction and venue in state court of Louisiana.

120.

Petitioners request a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, the Petitioners pray that:

1) Entergy be cited to appear and answer this SECOND AMENDED CLASS ACTION PETITION FOR DAMAGES AND JURY TRIAL REQUEST;

2) after due proceedings are had, that this action be certified as a class action pursuant to the provisions of La. C.C.P. art. 591, *et seq*., in the respects alleged hereinabove, for the purposes of determining the common issue of liability as well as damages, if the Court so desire and the basis for assessment of all damages, if any;

3) upon certification of the class action, the Court call for the formulation of a suitable management plan pursuant to La. C.C.P. art. 593(C);

4) following due proceedings, that the Defendants be ordered to maintain its transmission system in compliance with applicable standards; and

5) Following due proceedings, that there be judgment against Defendants and in favor of the Plaintiffs, awarding compensatory damages for  in an amount to be determined by this Honorable Court based on the claims of the individual class members, plus judicial interest from the date of judicial demand, for attorney's fees, for all costs of these proceedings, and for all other just and equitable relief.

Respectfully Submitted:

*/s/Celeste Brustowicz*

_____
Celeste Brustowicz ( LA#16835)
Stuart H. Smith (LA#17805)
Barry J. Cooper, Jr. (LA#27202)
Andrew Jacoby (LA# 32512)
COOPER LAW FIRM, LLC
1525 Religious Street
New Orleans, Louisiana 70130
Phone: 504-399-0009
Fax: 504-309-6989
Email: ajacoby@clfnola.com

**AND**

Juan Lafonta (LA#27541)
JUAN LAFONTA AND ASSOCIATES
6305 Elysian Fields Avenue, Suite 207
New Orleans, LA 70122
Phone: (504) 288-4911
Email: jlafonta@lafontalaw.com